**THIRD DIVISION
MCFADDEN, C. J.,
DOYLE, P. J., and HODGES, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 25, 2020**

# In the Court of Appeals of Georgia

A20A0036. ADVENTURE MOTORSPORTS REINSURANCE, LTD. et al. v. INTERSTATE NATIONAL DEALER SERVICES INC.     DO-002

A20A0037. INTERSTATE NATIONAL DEALER SERVICES INC. v. ADVENTURE MOTORSPORTS REINSURANCE LTD. et al.     DO-003

DOYLE, Presiding Judge.

These cases arise from a superior court order confirming an arbitration award in favor of Southern Mountain Adventures, LLC, ("the Dealer") and Adventure Motorsports Reinsurance, Ltd., ("the Reinsurer," collectively "the Claimants") in a claim they brought against Interstate National Dealer Services, Inc. ("INDS"). In Case No. A20A0036, the Claimants contend that the superior court erred by failing to enforce a post-judgment interest and cost provision. In Case No. A20A0037, INDS contends that the superior court erred by confirming the award because the arbitrator

unlawfully departed from the terms of the parties' written agreements. For the reasons that follow, we dismiss the appeal as moot in Case No. A20A0036, and we reverse in Case No. A20A0037.

The relevant factual background is not in dispute. The record shows that Southern Mountain Adventures is a motorsports vehicle dealership controlled by Ryan Hardwick, a former personal watercraft racer of some success in the 1990s. INDS is an administrator of vehicle service contracts and reinsurance programs. INDS provided these services through vehicle dealers who participated in the profit of service and roadside assistance contracts they sold to dealer customers.

In 2006, INDS and the Dealer entered into an agreement ("Producer Agreement") whereby the Dealer sold INDS's vehicle service contracts to the Dealer's customers in exchange for a front-end commission determined by the Dealer's own retail pricing less the commercial price ("Rate Card") the Dealer paid to INDS.[1] The Rate Card listed the price paid by dealers to INDS, according to the year, make, and model of the vehicles; and the Dealer was free to determine its own

---

[1] This is also referred to as the "Dealer Price Net Schedule."

2

retail markup above the Rate Card prices.[2] INDS then used the payments to cover the costs of marketing, administration, and performance of the service contracts, including: reserve funds to pay service and roadside assistance claims, administrative fees, agent commissions, and employee incentives. In addition to the commission, if reserves remained after the expiration of the contracts, the Dealer shared in a partial distribution of that profit.

In 2008, the parties moved from the profit-sharing model to a reinsurance plan. Under the reinsurance arrangement, the Dealer would continue to sell service contracts to its customers and pay INDS the amount on the Rate Card for each contract sold; likewise, INDS would continue to administer the contracts. But instead of the reserves being paid to INDS, the reserves were held by the Reinsurer, a newly-created entity controlled by Hardwick. The Reinsurer would hold the reserves, paying claims as needed, and at the end of the service contracts, the Reinsurer would be entitled to keep the reserves. During the term of the service contracts, the Reinsurer would reimburse INDS for vehicle service claims.

---

[2] In one of the contracts, INDS recommends that the Claimants set the retail price at 185% of the cost paid by the Claimants.

In 2014, the relationship soured, and the Dealer terminated its Producer Agreement with INDS.[3] Pursuant to an arbitration clause in the agreements, the Claimants initiated the underlying arbitration proceeding to recover charges they alleged were improperly collected by INDS over the course of the parties' dealings. Essentially, the Claimants argued that INDS collected fees that were not authorized by the Producer Agreement and concealed their use for purposes outside the scope of the agreement. Following an evidentiary hearing, the arbitrator agreed and awarded the Claimants $462,781 in excess fees paid by the Claimants to INDS. INDS initiated the present action in the superior court by filing a motion to vacate the award, and the Claimants filed a cross-motion to confirm the award. Following a hearing, the superior court confirmed the award and denied the Claimants' motion for fees and post-judgment interest. These appeals followed.

*Case No. A20A0036*

In this appeal, the Claimants contend that the superior court erred by failing to enforce the following provision of the arbitrator's award:

---

[3] The Producer Agreement allowed the Dealer to terminate at any time with 30 days notice.

4

If this Award is not paid in full by [INDS] to Claimants within 30 days of the date of the Award, Respondent will be charged interest at an annual rate prescribed under OCGA § 7-4-12 on the outstanding Award balance from the date of the Award until the Award is paid in full, plus reasonable costs of collection, including attorneys' fees, incurred by Claimants.

In light of our ruling below in Case No. A20A0037, holding that the trial court erred by confirming the arbitrator's award, this argument is moot, and the appeal is dismissed.

*Case No. A20A0037*

INDS contends that the superior court erred by confirming the award because the arbitrator ignored the contractual language agreed to by the parties. We agree.

INDS challenges the award under OCGA § 9-9-13 (b) (3) and (5), which provide that a superior court has authority to vacate an arbitration award "if the court finds that the rights of [a] party were prejudiced by: . . . (3) An overstepping by the arbitrators of their authority or such imperfect execution of it that a final and definite award upon the subject matter submitted was not made . . . or . . . (5) The arbitrator's manifest disregard of the law."

> In the arbitration context, the concept of manifest disregard has never been the equivalent of insufficiency of the evidence or a

5

misapplication of the law to the facts. It is a much narrower standard, requiring a showing in the record, other than the result obtained, that the arbitrators knew the law and expressly disregarded it. Arbitrators must deliberately ignore applicable law to fall within the manifest disregard prohibition in OCGA § 9-9-13 (b) (5).[4]

Further,

[d]uring arbitration proceedings, the general rules of contract construction apply. An arbitration award should be consistent with terms of the underlying agreement and reflect the "essence" of that contract; it must not demonstrate an "imperfect execution" of the arbitrator's authority. Although an arbitrator has some latitude in fashioning remedies, he is not free to ignore the express terms of a valid and enforceable contract.[5]

Here, the arbitrator's award found that INDS drafted the insurance agreements without explicit authorization to recover certain fees. Specifically, the arbitrator's award concludes that INDS was only authorized to collect money to pay "warranty

---

[4] (Citation, punctuation, and emphasis omitted.) *Airtab, Inc. v. Limbach Co., LLC*, 295 Ga. App. 720, 722 (2) (a) (673 SE2d 69) (2009).

[5] (Citations omitted.) *Sweatt v. Intl. Dev. Corp.*, 242 Ga. App. 753, 755 (1) (531 SE2d 192) (2000). See also *King v. King*, 354 Ga. App. 19, 25 (2) (b) (840 SE2d 108) (2020) (same).

6

claims" and "fees associated with contracts written."[6] Based on this, the arbitrator concluded that INDS was only authorized to collect funds from the Claimants to cover the cost of warranty claims and adjustment expenses, a third-party consumer protection policy, and premium taxes. By contrast, with respect to charges for administrative fees, agent commissions, non-claim reserves for an employee incentive program, and roadside assistance benefits, the arbitrator concluded that these charges were not authorized by the contracts between the Claimants and INDS.

INDS argues that this, in essence, ignores the fact that the parties agreed to the prices set out in the Rate Card, which reflected the only amount ever paid to INDS by the Claimants. INDS points out that it is undisputed that the contracts required the Claimants to "[u]tilize the pricing structures . . . issued by [INDS] from time to time," that the Rate Card reflected those prices, and it was the only amount ever charged by INDS. For example, the 2006 Producer Agreement set the Claimant's commission as the amount "equal to the amount of the retail price of Contract less Contract Cost as set forth in the" Rate Card. The Claimants were free to set their retail pricing at their

---

[6] The arbitrator also noted that a "ceding fee" provision was left blank, which INDS argues reflects the fact that it did not charge a ceding fee, but which provision the arbitrator found to be contrary to industry practice because such fees are "generally paid to cover costs and expenses anticipated to be incurred by the administrator of a reinsurance program."

own discretion and keep the net amount after paying INDS the Rate Card price. In sum, there is no evidence or dispute that INDS ever charged the Claimants anything other than the price reflected in the Rate Card, which was the price agreed to by the parties.

When addressing the Rate Card, the arbitrator explained:

[INDS]'s repeated reliance . . . on the Rate Card . . . as drafted by [INDS] and utilized only between the parties in pricing the cost of warranty coverage . . . sold by Claimants to its retail customers, as identifying the authority for [INDS] to unilaterally recover or pay itself charges and fees is disingenuous and without a factual basis. [INDS's] assertion is not supported by testimony or evidence other than [INDS's] making the assertion repeatedly, which assertion was convincingly challenged by Claimants.

Nevertheless, it remains true in Georgia that parties are free to contract as they see fit, and those contracts are binding and enforceable provided they are consistent with law and public policy.[7] Neither the Claimants nor the arbitrator identified any amount paid to INDS outside of the prices reflected in the contracts and on the Rate

---

[7] See *RSN Properties v. Engineering Consulting Svcs.*, 301 Ga. App. 52, 53 (686 SE2d 853) (2009) ("Unless prohibited by statute or public policy, the parties to a contract are free to contract on any terms and about any subject matter in which they have an interest.") (punctuation omitted).

Card, so this is not a case involving unreviewable factual errors.[8] That INDS used those payments to run its business, pay its costs, and retain a profit is not a ground for eliminating the Claimants' contractual liability to pay INDS the prices listed on the Rate Card. The arbitrator's explicit rejection of the Rate Card as the contracted-for pricing ignores the express contractual language requiring the Claimants to "utilize the pricing structures" provided by INDS and transmit completed service applications "together with appropriate monies due INDS from" the Claimants' sales. Accordingly, by explicitly rejecting the contractual language, the arbitrator manifestly disregarded the law, and the superior court erred by confirming the award.[9]

*Appeal dismissed as moot in Case No. A20A0036; judgment reversed in Case No. A20A0037. McFadden, C. J., and Hodges, J., concur.*

---

[8] See, e.g., *McGill Homes, Inc. v. Weaver*, 278 Ga. App. 622, 623 (629 SE2d 535) (2006) ("[I]t is evident that [the party's] claims of 'manifest disregard of the law' are nothing more than unreviewable factual issues.") (punctuation omitted).

[9] See *Sweatt*, 242 Ga. App. at 757 (2).